THE PEOPLE, *ex rel.* Dinsmore & Wood, *vs.* THE CROTON AQUEDUCT BOARD OF THE CITY OF NEW YORK.

THE PEOPLE, *ex rel.* J. P. Cumming and T. Cumming, jun., *vs.* THE SAME DEFENDANTS.

Under section 501 of the ordinance of 1849, organizing the departments of the corporation of the city of New York, which provides that no bid or estimate for a corporation contract shall be rejected for any error of form, provided the persons making it shall correct the same, and make it in conformity with the ordinance, within twenty-four hours after *notice* of such defect, the notice of any defect need not be in *writing.*

Under section 497 of that ordinance, which requires the estimate to contain certain statements, and that it shall be verified by the oath of the *party* making the same, if an estimate is made by a partnership, the oath of *each partner* is necessary.

To warrant the granting of a *mandamus,* the applicant must have a clear legal right.

A bidder on proposals issued by the city corporation for estimates, acquires no *legal right* or cause of action, to enforce which a mandamus will be issued, until the contract has been made with him, and approved by the common council, as provided by section 494 of the ordinance of 1849.

Where the ·Croton Aqueduct Board advertised for proposals for the construction of a new reservoir, and D. & W. made and presented an esti-

mate or bid which was rejected by the board as being defective, for want of a proper verification, and the contract was awarded to a higher bidder; *Held* that a mandamus would not be granted in behalf of D. & W. requiring the Croton Aqueduct Board to *entertain and consider* their bid, and thereupon to award the contract to the lowest bidder.

*Held also*, that the writ could not be issued, on the application of other bidders claiming to be the lowest bidders who had complied with the ordinance, directing the board *to award the contract* to the applicants as being the lowest bidders.

APPEAL, in the first of the above causes, from an order made at a special term, denying a motion for a mandamus; and motion, in the second cause, for a mandamus, ordered to be heard, in the first instance, at a general term. In July, 1857, the Croton Aqueduct Board of the city of New York advertised for proposals for the construction of a new Croton reservoir in Central park. Proposals were put in by a number of persons; the three lowest being by Dinsmore & Wood; by Fairchild, Holman, Walker & Brown, and by John P. and Thomas Cumming, jun. The proposal of Dinsmore & Wood was the lowest of all. This proposal, on the opening of the bids by the Croton Aqueduct Board, on the 26th of August, 1857, was objected to as defective. The only defect necessary to be here stated was in the verification of the estimate. It was verified by the oath of Dinsmore alone, instead of being verified by both Dinsmore & Wood. This, it was contended, was not a compliance with section 497 of the ordinance of 1849, organizing the departments of the corporation, which requires such estimates to be verified by the oath of the party making the same. This defect in the bid was orally announced at the meeting of the board, and the bid publicly laid aside as defective, for want of sufficient verification; and this was done in the presence and hearing of Dinsmore; but no written notice was ever given to either bidder, nor any communication made by the board to Wood. Dinsmore & Wood subsequently applied for a mandamus requiring the Croton Aqueduct Board to *entertain and consider* their bid, and thereupon to award the contract to the lowest bidder.

The motion for the madamus was heard at special term before Justice PEABODY, and was denied; the following opinion being rendered by him:

PEABODY, J. "The Croton Aqueduct Board, in July, 1857, issued proposals and advertised for bids for the construction at New York hill of a new reservoir for the Croton water, to cover 106 acres of land, and to be 40 feet in depth. The relators in due time made their bid or estimate for the work, in which they offered to do it in 600 working days, for $524,298.97, which, they say, was a less sum than was bidden by any one else. The defendants refused to consider or entertain the bid for two reasons, to which, on the argument, they added a third.

1. That the estimate of the relators was verified by the oath of one only of the relators, namely, Dinsmore, whereas it should have been by the oaths of both.

2. That the estimate, being made by the relators under the firm name of Dinsmore, Wood & Co., was in violation of the statute prohibiting the use of the words, " and company," or " and Co.," except to the present and actual partner.

3. On the argument the objection was made, for the first time, that the persons offering themselves as sureties had not added to their names their places of residence, respectively.

As to the first of these objections, part 3 of title 3, of an ordinance passed May 30, 1849, did establish certain regulations relative to contracts to be made, as follows : § 497 provides that each estimate shall contain, among other things, 1. The name and place of residence of the person making it. 2. The names of all persons interested with him therein, and if no other person be so interested, shall distinctly state that fact. 3. That it is without connection with any other person making an estimate for the same purpose, and is fair, &c. 4. That no member of the common council, head of department, chief of bureau, deputy thereof, or clerk therein, or other officer of the corporation, is directly or indirectly interested therein,

&c. &c. And section 498 provides as follows: "It (meaning the estimate) shall be verified by the oath, in writing, of the party making the estimate, that the several matters stated therein are in all respects true." An oath in this case was made by Dinsmore alone, and none was made by Wood; and it is urged, as a reason for excluding and refusing to consider the bid, that the oath was not sufficient, but the oath of both was required by the ordinance.

The estimate was made by the relators, (to quote the language in which they describe themselves,) by John M. Wood, of Portland, Maine, and Samuel P. Dinsmore, of the city, county and state of New York, "under the name and style of Dinsmore, Wood & Co." The argument, on both sides, seemed to assume, that the estimate was made by the firm of Samuel P. Dinsmore & Co., composed of the relators, and I am inclined to think that this is the case. The parties describe themselves in the body of the paper by, and in form make the estimate in, their individual names, adding thereto the words, "under the name and style of Dinsmore, Wood & Co." It commences, "Proposals" * * * * "made by John M. Wood of * * * and Samuel P. Dinsmore of" * * *. They do not assume to contract in form as a firm, nor do they even describe themselves as members of, or say that they compose, the firm. This looks more like the act of the individuals jointly than that of the partnership, but the addendum, "under the name and style of Dinsmore, Wood & Co.," is entirely unmeaning, unless it means that the individuals, who are so described, are acting as the firm or partnership of that name. This, I think, is the meaning of the language in this part of the proposals, and the signatures are quite consistent with this interpretation. The paper is signed with the full names of the two partners individually, and also with the name of the firm; and here the name of the firm seems to be entirely without effect or purpose, if the act is not done by it rather than the individuals; whereas, the use of the names of the partners (although unnecessary) is

not so inconsistent with the idea that they intend to contract as a partnership firm.

Assuming, then, that the bid is made by the partnership firm of Dinsmore, Wood & Co., composed of Samuel P. Dinsmore and John M. Wood, is the oath of Dinsmore alone a compliance with section 498, which requires that " it (the estimate) shall be verified by the oath, in writing, of the party making the estimate, &c. &c: ?

To my mind the question is one of no ordinary difficulty ; and the very able arguments have left me in great doubts about it. The literal meaning of the word " party" affords no guide. It is as consistent with the claim of one party as the other. It means, as naturally, a body composed of several individuals, as a body sole and individual, and no more so. The term " party," used in reference to a contract like this, (for this estimate is a contract in itself, or one part of a contract,) may as readily mean a class or body consisting of several members, who hold a certain relation to it, as one member, the sole representative of that interest ; and the term would be equally proper in speaking of the author of this estimate, if that author were a single man, or a partnership firm, or a corporation ; or, indeed, any number of persons composing the body, provided they were united in interest and acting jointly as a unit. In this case, for instance, Messrs. Dinsmore and Wood were, beyond all question, competent members of the firm of Dinsmore, Wood & Co., and as to the world, and all persons other than themselves, whenever they act together as a firm, they are properly styled a party to the transaction in reference to which they act ; while among themselves (*inter sese*) each of them, in reference to the other, is properly styled a party, and the two together are properly, as to each other, styled parties. Each of them, for instance, is a party to the contract of partnership between them, while the two together are with equal propriety styled a party or one party, in relation to this estimate or contract.

The abstract, lexicographical definition, or meaning of the

term, affords no aid in this inquiry. It every where implies unity; but is as properly used to signify a unit composed of many parts, as an individual, or one incapable of division, actual or speculative, if such an one can be. We must, therefore, look to other sources for light on this subject. It must be drawn from the context and the connection in which it is used, and here too it can be found only with great difficulty and is very dim.

Section 497 provides, that the estimate shall contain (1st,) "The name and place of residence of the *person* making the same." Here the word "person" is used. Not that the estimate must not be made by more than one person, for it evidently may be made by more than one; while the word itself cannot literally signify more than one; and the meaning of this sentence is, that the estimate must contain the name and place of residence of the person making it, *and the names and places of residence of the persons, if there be more than one person making it.* So subdivision second of the same section provides, that the estimate shall contain the names of all persons interested with "*him*," as if the bid or estimate could only be made by a single person, which, (as I have said,) it is apparent to any one, could not have been intended. In both these places in this section (497) the words used, when the author or maker of the estimate is intended, are words which in themselves can mean only one; and yet so obvious is the necessity for applying these provisions to a case where the bid is made by more than one, that the legal reading of it must, in each case, be made to include in its signification and interest the plural as well as the singular of these words. No one can doubt that this section requires that the estimate shall contain, (first,) the name and place of residence of the person, and the name and places of residence of the *persons*, if there be more than one person, &c. &c.; and (second,) that it shall contain the names of all persons interested with "him" or *them*, if the bid be made by more than one person. The next section of the ordinance (498) is the one above

quoted, which requires the verification of the estimate by the written oath of "the party" making it. Here the word "party" is used in speaking of the same being who, in the preceding section, is always spoken of as "person." Here, too, as there, it is quite certain that the author of the bid spoken of may be either one person or more, and the word "party" is intended to express one or more, as the bid may be made by one or more.

The word "person," in the preceding section, wherever it occurs, means one or more, and should be read "person or persons." The change of phraseology, in passing from that section to this, is the substitution of the word "party" in this, for the word "persons" in the preceding; and, as the word used to express the same meaning in the earlier section must evidently be read to signify one or more, so must its substitute or representative be so read, and ".party" here means, and must be held to embrace, all the persons making it, be the number one or more. This section, then, requiring the verication of the estimate by the oath of the party making it, in effect, requires the verification of it by the oath of the party (person or persons) making it, whatever the number may be. The definite article before the word oath is more consistent with this than the opposing theory. If the section required only *an* oath of the party, it would be less definite, and if it required only verification by the party *on* oath, it might be more easily held that a single oath was sufficient. If it required that it should by *an* oath of the party making it, I should think that the oath of any one of several persons composing the party would certainly be sufficient. So the use of the same article before the word "party" tends to strengthen my view. The oath of a party would not so certainly mean the oath of more than one of several persons composing the party. I think that the language, "*the* oath of *the* party," naturally means more than the language, "oath of the party," and more than "an oath of the party;" and still more plainly, more than "an oath of a party," or "oath of a party."

The People *v.* The Croton Aqueduct Board.

In the view I have taken, it is not necessary to the decision of this motion, that I should consider the other reasons urged for refusing to entertain the bid

Whether the error was one of form or substance, may be somewhat doubtful, though I am inclined to think that the entire omission of the oath of a party, whose oath is required, is matter of substance ; that the verbal statement of the objection, by the board, to Mr. Dinsmore, is a good notice to both, of the defect. The bill, I think, did not conform to the ordinance strictly, and as the rule established by precedents, by which I am bound, is *strictissimus*, I am compelled to refuse the peremptory *mandamus.*"

The relators appealed from that decision to the general term. Pending their appeal, the Croton Aqueduct Board having decided to award the contract to Fairchild & Co., the Messrs. Cumming applied at special term for a mandamus to compel the board *to award it* to them instead. This application was based upon the ground that the bid of Fairchild & Co. was fatally defective, in that the sureties offered were insufficient. The motion of Cumming & Cumming was ordered by the special term to be heard at the general term in the first instance ;—and the appeal of Dinsmore & Wood from the order denying their mandamus, and the original motion of the Messrs. Cumming now came on to be heard together, by agreement of counsel.

*Abbott Brothers* and *C. O'Conor*, for Dinsmore & Wood.

*R. Busteed* and *Jas. R. Whiting*, for the Croton Aqueduct Board.

*By the Court*, MITCHELL, P. J. The first of these cases comes up on appeal from a decision made at special term, refusing a mandamus ; the second is an original application for the same remedy, for other persons.

The Croton Aqueduct Board advertised for proposals for making a new reservoir. Dinsmore & Wood presented their proposals, and were apparently the lowest bidders. But the proposals were presented in the name of Dinsmore, Wood *& Co.*, when there was no third person in partnership with them. They were signed in the name of Dinsmore, and in the name of Wood, as well as in the name of Dinsmore, Wood *& Co.;* and no person made the necessary affidavit except Dinsmore. Wood made no affidavit. At the appointed hour and place the bids were opened by the board, sitting as such, and the comptroller being then present, as also Dinsmore and other contractors. The omission of Wood's affidavit was then noticed, and the bid of that firm was declared by the board defective, and on that account absolutely rejected by them. The fact of such rejection was publicly announced by the board, and notice thereof given on the spot, to Dinsmore. The defect was not supplied within twenty-four hours after this notice, nor until the 31st of the same month.

The ordinance organizing the departments of the corporation (§ 501) requires all bids to be rejected which are not furnished in conformity with sections 497, 498 and 499, and that thereupon the contract be awarded to the lowest bidder ; but provides that no bid shall be rejected for any error of form, provided the persons making it shall correct the same and make it, in conformity with the ordinance, within twenty-four hours after notice of such defect.

The short time in which our decision is to be made, forbids our doing much more than stating our conclusions, without our reasons for them.

The notice required by the ordinance need not be in writing ; the law implies that all notices should be in writing which form part of a judicial proceeding, but not those relating to the formation of contracts. The notice, although it pronounced the proposal fatally defective, was sufficient. It pointed out what the defect was, and then it was incumbent

The People *v.* The Croton Aqueduct Board.

on Dinsmore to judge for himself whether the defect could be cured or not.

The ordinance seems to recognize that there may be a departure from its requirements, which may be deemed an error of *form,* and that such error may be cured ; but it can hardly be, that under " error of *form*" would be included an utter neglect of *all* the required preliminaries. Preliminary matters were required of the bidders, with a view to prevent a violation of the laws and ordinances as to contracts ; laws and ordinances which were passed with the intention of excluding certain classes of persons from being interested in contracts, on the supposition that, if interested, they would have opportunities of gaining unfair advantages, and sometimes would authorize work to be done more because they would wish the profit of the contract, than from a belief that the public needed it. The exclusion of these persons was not a matter of form, and so the due proof which the ordinances required, that no such persons were interested, could not be a matter of form. The entire omission of that affidavit would be fatally defective.

There are other matters required by the ordinance, which are matters of convenience only, such as the residence of the person making the bid, the furnishing of the estimate to the *head* of the department, and at *his office.*

Section 497 requires the estimate to contain certain statements ; among others, that no member of the common council is interested ; and it is to state the names of all persons who are interested. It is to be verified by the oath of the party making the estimate. The party making the estimate was not Dinsmore or Wood alone, but both of them ; it was an appropriate use of the term " party" in this case, as it referred to a contract, in which those on each side or part of the contract are called parties or party. The object of the affidavit was like that of the old answer in chancery, to search the conscience of the *affiant;* for this purpose the oath of each was equally necessary in both cases. It was not enough for one

alone to make his affidavit; that did not gain the object of the law—the searching of the conscience of the other.

To sustain a *mandamus*, the applicant must have a *clear legal right.* (*The People* v. *The Canal Board,* 13 *Barb.* 443. *People* v. *Supervisors of Columbia County,* 10 *Wend.* 365.) Has a bidder on proposals for estimates, any legal rights—any cause of action—until the contract is made with *him,* and approved by the common council? The mayor and common council represent the corporation of New York. As a general rule no corporation can be bound without its consent, manifested by an act of the corporate body. The same rule applies to the city of New York, unless an alteration has been made by the acts of 1849, 1853, and by the charter of 1857. Section 39 of the last act requires all *contracts* that are to be made by authority of the common council, to be *made* by the heads of departments *under such regulations* as shall be established by ordinances of the common council. So, when work is to be done, or supplies furnished to complete a particular job, and the expense together exceeds $250, it is to be by contract, under regulations established by ordinances of the common council, unless three-fourths of the members elected to each board order otherwise. All contracts are to be entered into by the heads of departments, and to be founded on sealed proposals, and to be given to the lowest bidder who gives security in the manner required by the ordinances, and the terms of whose contract must have been settled by the *corporation counsel* in previous specifications, prepared as a preliminary to his bid. Thus far, it does seem as if the heads of departments were assimilated to the heads of our state and national departments, who make contracts without the necessity of the legislature ratifying them; the legislature only ordering the contracts to be made, not making them. But the contracts in all these cases are to be made under regulations established by ordinances of the corporation. Section 32 of this act declares that the existing ordinances shall apply to the departments, so far as the same are applicable and not incon-

sistent with this act.   Section 491 of the ordinances is consistent with the act, and forbids any contract to be made, signed or executed, for a sum exceeding $250, until all the proposals, estimates, contracts, and papers relating thereto shall have been laid before the common council and *confirmed* by them, and an appropriation made therefor.   The acts of 1849 and of 1853 were sufficiently similar to the act of 1857 to be guides as to the interpretation of the last; and the ordinance last quoted was deemed consistent with those acts.   It is so, in fact: those acts gave power to the heads of departments to make contracts, in order to take the power of selecting a contractor from the common council; to throw an additional check on the making of contracts, not to take off any *check* which the corporation before held over them—not to throw into the hands of heads of departments the absolute right to make a contract which had been found to be dangerous when exercised by the common council *alone*.   In the spirit of those laws the common council made this ordinance, (§ 494,) forbidding any contract to be made until it be *confirmed* by them, and an appropriation be made therefor.   The common council thus retain a *veto* on all contracts; it cannot, of itself, make any; the heads of departments cannot make, sign, or execute any without the approval of the common council, but are the executive officers, who, when the work is ordered, are to originate the contracts, and complete them, when the common council confirms them.   Before this is done by the common council, no contract is made, and no right of action arises in favor of any contractor.   The common council may consider all the bids too high, and refuse to have the work done at such prices; they may find such a change in their finances between the first suggestion of the work and the presentment of the bids, that what was prudent at the first period may have become wasteful extravagance at the last. They may have no funds to appropriate for such purposes, or the lowest bid may far exceed the sums which the law allows them to appropriate: for these and other reasons, the power

is reserved to them, who are to incur and pay the debt, to decide whether they will incur it or not, when the lowest price for which it can be done is presented to them.    Besides, these various laws were made, not to give a right to the lowest bidder to have a contract made with him; they were not made for his benefit, but for the benefit of the public alone, and that the public might have the work done at the lowest price.

In this view of the law, the lowest bidder has no cause of action, if the work should now be done; nor any remedy against the corporation, if the work is given to another, although a higher bidder.    The officers giving the contract to a higher bidder might, perhaps, be responsible, and the corporation might be exempt from any payment beyond the lowest bid, and in those respects the law would be defective.

This last objection applies to the motions in both cases. The order denying the mandamus in the first case should be affirmed with costs; the motion in the second case, for a mandamus, should be denied with costs.

[NEW YORK GENERAL TERM, December 26, 1857.    *Mitchell, Roosevelt* and *Clerke,* Justices.]